UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

WYNDHAM HOTEL GROUP
INTERNATIONAL, INC.,

                  Plaintiff,

        -v-

SILVER ENTERTAINMENT LLC, et al.,
                  Defendants.

15-CV-7996 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

In 2015, the Veneto Hotel & Casino, a Wyndham franchise hotel, was seized by the

Panamanian government for failure to pay gaming taxes, leading Wyndham to terminate its

franchise agreement. Wyndham then sued for damages arising out of the termination, and the

defendants counterclaimed for Wyndham's alleged breach of its obligations as franchisor.

Wyndham now moves for summary judgment on both sets of claims. For the reasons that

follow, the motion is granted in part and denied in part.

I.      **Background**

The following facts are taken from parties' respective statements of material facts and are

not subject to a genuine dispute unless otherwise noted.[1]

A.      **The 2007 Franchise Agreement**

The Veneto Hotel & Casino is located in Panama City, Panama. (Dkt. No. 118 ¶ 7.)

Brothers Alexander and Andrew Silverman bought the hotel through one of their corporate

entities for $85 million in 2006. (Dkt. No. 118 ¶ 12.) In March 2007, Silver Entertainment LLC

---

[1]     Page numbers refer to Bates Numbers, and citations to the record use the parties'
exhibit names; Plaintiff's exhibits are numbered and attached to Docket Numbers 110 and 127,
and Defendants' exhibits are lettered and attached to Docket Number 119.

("Silver"), jointly owned by the Silverman brothers, entered into a franchise agreement with Plaintiff Wyndham Hotel Group International, Inc. (the "Franchise Agreement").  (Dkt. No. 118 ¶¶ 1–4, 19.)  The Veneto hotel reopened as the "Veneto – A Wyndham Grand Hotel" five months later.  (Dkt. No. 118 ¶¶ 19, 46.)

As relevant to this case, the Franchise Agreement imposed two financial obligations on Silver.  First, it required Silver to pay Wyndham various recurring fees during the ten-year term of the franchise, including royalties, a marketing fee, reservation system fees, and an international sales fee.  (Ex. 7 §§ 3, 28; Dkt. No. 118 ¶¶ 20–24, 16–27.)  Second, it allowed Wyndham to terminate the agreement for a variety of reasons—including an uncured default on past-due fees or the franchisee's loss of "ownership or possession" of the hotel—and gave Wyndham the right to collect a lump-sum payment as liquidated damages in the event of premature termination.  (Ex. 7 §§ 17(B)(1), 17(C), 18(E); Dkt. No. 118 ¶¶ 31–33.)  In a standalone guaranty attached to the Franchise Agreement, Silver "absolutely, unconditionally and irrevocably" guaranteed that all of its "obligations under the [Franchise] Agreement" would be "punctually paid and performed."  (Ex. 7 at SE0060019; Dkt. No. 118 ¶ 41.)

Shortly after acquiring the Veneto hotel, Silver transferred ownership of the property to its subsidiary corporation, Veneto Hotel & Casino, S.A. ("Veneto").  (Dkt. No. 118 ¶¶ 5–7, 43.) Veneto subsequently took out a $60 million loan from the German American Capital Corporation ("GACC") (Dkt. No. 118 ¶ 45), and separately entered into an Assignment and Assumption Agreement ("Assignment") with Wyndham and Silver.  (Dkt. No. 118 ¶ 43.)  Under the Assignment, Veneto assumed all of Silver's "rights, benefits and obligations" under the Franchise Agreement.  (Ex. 8 ¶ 2; Dkt. No. 118 ¶ 43.)  The Assignment did not modify the

guaranty, which "remain[ed] in place[] without any further conditions or alterations."  (Ex. 8 ¶ 2; Dkt. No. 118 ¶ 44.)

Several months after the assignment, Wyndham made an $850,000 loan to Veneto in the form of a Development Advance Note (the "Note").  (Ex. 10; Dkt. No. 118 ¶ 47.)  The Note provided that "one-tenth of the original principal amount will be forgiven without payment" on "each anniversary" of the hotel's opening date, but that the outstanding balance of the Note would become "immediately due and payable," with 18% interest, upon early termination of the Franchise Agreement.  (Ex. 10 at WHG00008086; Dkt. No. 118 ¶¶ 47–48.)  The Note, although signed by Veneto as principal obligor, was guaranteed by Allen Silverman, father of the Silverman brothers.  (Ex. 10 at WHG00008087; Dkt. No. 118 ¶ 47.)

### B.    The 2012 Amendment and GACC Loan Modification

Over the course of the next five years, the relationship between franchisor and franchisee soured.  Defendants contend that Wyndham was ill-prepared to support the expansion of the franchise to Panama, and Veneto frequently complained to Wyndham about a lack of Spanish-language marketing materials, technical issues with Wyndham's centralized reservations system, and disappointing group-sales numbers.  (*See, e.g.*, Dkt. No. 118 ¶¶ 58, 60–63; Ex. CAF 77:2–79:17, 120:16–122:13, 155:16–159:8; Ex. CAC 257:22–24; Exs. BAE, BAJ, BAL, BAN, BAM.)

In response, Wyndham and Defendants negotiated and executed an amendment to the Franchise Agreement on April 1, 2012 (the "Amendment").  (Ex. 15; Dkt. No. 118 ¶ 50.)  The Amendment reduced various categories of recurring fees (*see* Ex. 15 §§ 1–7; Dkt. No. 118 ¶¶ 51–55), including lowering the "national sales fee" from 1% to 0.25% "until the later of (i) March 31, 2012 or (ii) such time as a Spanish language reservation system, website and related services for the system have been implemented and tested by [Wyndham] and are fully operational."  (Ex. 15 § 5.)  The Amendment also contained a mutual release of liability by

3

which Veneto and Wyndham agreed to "release each other . . . from any and all claims arising out [of] or relating to the Franchise Agreement, that were or could have been asserted by or against Franchisor and Franchisee . . . prior to and through the date of this Amendment." (Ex. 15 § 8.)

Separately, Veneto and GACC entered into a loan modification agreement in 2012. (Dkt. No. 118 ¶ 64.) The modification extended the loan's maturity date by several years, but it also required Veneto to make an immediate $5 million payment, reducing the outstanding principal to $55 million. (Dkt. No. 118 ¶¶ 64–65.)

### C.    Termination of the Franchise Agreement

The Veneto hotel soon fell into financial difficulties. In June 2014, Wyndham issued Veneto a notice of monetary default on $240,383.02 in past-due recurring fees. (Dkt. No. 118 ¶ 102.) In January 2015, GACC issued a notice of default to Veneto, accelerated its loan, and stopped disbursing funds to Veneto. (Dkt. No. 118 ¶¶ 88–90.)

Also in January 2015, the Panamanian Gaming Control Board notified Veneto that its gaming taxes were in arrears. (Dkt. No. 118 ¶ 93.) Defendants did not cure the deficiency, and the Gaming Control Board issued an order in April 2015 appointing a receiver to run the hotel. (Dkt. No. 118 ¶¶ 98.) The government receiver has been in control ever since, and Defendants have been denied access to the property. (Dkt. No. 118 ¶¶ 98, 100–01.)

On May 21, 2015, Wyndham issued another notice of default, this time for $547,710.74 in recurring fees, and threatened to terminate the Franchise Agreement if the default was not cured within ten days. (Dkt. No. 118 ¶¶ 103–04.) Defendants did not pay Wyndham, and Wyndham formally terminated the Franchise Agreement on July 28, 2015. (Dkt. No. 118 ¶ 108.) As grounds for termination, Wyndham cited both Veneto's failure to cure its financial default and its loss of control of the hotel. (*Id.*)

### D. Procedural History

Wyndham filed suit in October 2015 against Silver and Allen Silverman, seeking payment of outstanding recurring fees, liquidated damages, and the principal balance due under the Note. (Dkt. No. 1 ¶ 34.) The Court stayed the action as against Silverman in July 2016, and Veneto was voluntarily added as a defendant at Silver's request in January 2017. (*See* Dkt. No. 70.) Silver and Veneto subsequently counterclaimed, alleging that Wyndham breached the Franchise Agreement. Wyndham now moves for summary judgment on both its affirmative claims and Defendants' counterclaims. (Dkt. No. 108.)

## II. Legal Standard

Under Federal Rule of Civil Procedure 56, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And an issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

"The moving party bears the initial burden of demonstrating 'the absence of a genuine issue of material fact.'" *F.D.I.C. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Once this burden is met, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id.* The court must "constru[e] the evidence in the light most favorable to the nonmoving party and draw[] all reasonable inferences in its favor." *Sledge v. Kooi*, 564 F.3d 105, 108 (2d Cir. 2009). However, "[t]o defeat a summary judgment motion, the non-moving party 'must do more than simply show that there is some metaphysical doubt as to the material facts,' and 'may not rely on conclusory allegations or unsubstantiated speculation.'"

*Great Am. Ins. Co.*, 607 F.3d at 292 (citation omitted) (first quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), then quoting *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998)). "If the non-moving party fails to establish the existence of an essential element of the case on which it bears the burden of proof at trial, summary judgment must be granted." *Decker v. Middletown Walmart Supercenter Store*, No. 15 Civ. 2886, 2017 WL 568761, at *3 (S.D.N.Y. Feb. 10, 2017).

"Statements in an affidavit or Rule 56.1 statement are inappropriate if they are not based on personal knowledge, contain inadmissible hearsay, are conclusory or argumentative, or do not cite to supporting evidence." *Epstein v. Kemper Ins. Companies*, 210 F. Supp. 2d 308, 314 (S.D.N.Y. 2002). In the discussion that follows, the Court "decline[s] to consider those aspects" of the parties' evidentiary submissions "that do not appear to be based on personal knowledge or are otherwise inadmissible." *Doe v. Nat'l Bd. of Podiatric Med. Examiners*, No. 03 Civ. 4034, 2004 WL 912599, at *4 (S.D.N.Y. Apr. 29, 2004).[2]

The parties agree that both the Franchise Agreement and the Note contain choice-of-law clauses selecting the law of New Jersey (Ex. 7 § 27(A); Ex. 10 at WHG00008086–87), and consequently the Court will apply New Jersey law to this action.[3] (*See* Dkt. No. 118 ¶¶ 40, 49.)

---

[2]     Defendants move to strike various portions of Wyndham's reply brief as procedurally improper. (Dkt. No. 130.) Where the Court concludes that the reply brief improperly raises new factual and legal arguments, the Court disregards those arguments. Consequently, the Court denies Defendants' motion to file a sur-reply.

[3]     The Court exercises subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332: The amount in controversy exceeds $75,000 (Dkt. No. 1 ¶¶ 5, 34, 37), and the parties are completely diverse. Plaintiff Wyndham Hotel Group International, Inc. is a citizen of Delaware and New Jersey (Dkt. No. 118 ¶ 1); Defendant Silver Entertainment LLC takes the citizenship of each of its members (the Silverman brothers), *see Bayerische Landesbank, New York Branch v. Aladdin Capital Mgmt. LLC*, 692 F.3d 42, 49 (2d Cir. 2012), both of whom are citizens of New York (Dkt. No. 118 ¶ 4; Ex. CAG 6:17–19; Ex. CAF 9:19–10:7); Defendant Allen Silverman is a citizen of New York (Dkt. No. 1 ¶ 2); and Defendant Veneto Hotel & Casino, S.A. is a citizen of Panama and New York (Dkt. No. 118 ¶ 5).

## III.    Discussion

"The question whether a [contract] term is clear or ambiguous" and "[t]he construction of an unambiguous term in a contract" are both matters of law for the court to decide.  *Nevets C.M., Inc. v. Nissho Iwai Am. Corp.*, 726 F. Supp. 525, 531 (D.N.J. 1989), *aff'd sub nom. Appeal of Nevets C.M., Inc.*, 899 F.2d 1218 (3d Cir. 1990).  In contrast, "[t]he interpretation of ambiguous terms in a contract is generally a question of fact."  *Id.*

At the outset, the Court concludes that the Franchise Agreement and Amendment are unambiguous as to two matters.  First, the Amendment contains a full release of liability for "any and all claims" arising on or before April 1, 2012 (the "Release").  (Ex. 15 § 8; *see also* Dkt. No. 118 ¶¶ 56–57.)  Thus, any breaching conduct before that date is immaterial.

Second, the Franchise Agreement and Amendment include all of the binding promises made by Wyndham to Silver (and its successor Veneto) and vice versa.  (*See* Dkt. No. 118 ¶¶ 18, 38–39.)  The text of these contracts makes it clear that the parties intended their terms to be a "final expression" of the parties' agreement, and consequently they "may not be contradicted by evidence of any prior agreement."  N.J. Stat. Ann. § 12A:2–202; *see also Telecom Int'l Am., Ltd. v. AT & T Corp.*, 280 F.3d 175, 190 (2d Cir. 2001) ("New Jersey's parol evidence rule is 'unusually rigid.'" (quoting N.J. Stat. Ann. § 12A:2–316 cmt. 5)).  The Court will therefore consider extrinsic evidence of Wyndham's franchise negotiations with Defendants only to the extent that it helps interpret the terms of the resulting written agreements.  *See Atl. N. Airlines v. Schwimmer*, 12 N.J. 293, 301–02 (1953).

As both a counterclaim and as an affirmative defense, Defendants allege that Wyndham breached the Franchise Agreement and thereby caused the Veneto hotel to fail.  Therefore, the Court will discuss Defendants' counterclaims first, followed by Wyndham's affirmative claims.

### A.    Defendants' Counterclaims Against Wyndham

#### 1.    Franchisor Services

Defendants' first and third counterclaims assert breach of contract and breach of the covenant of good faith and fair dealing.  *See Sons of Thunder, Inc. v. Borden, Inc.*, 148 N.J. 396, 420 (1997) ("[E]very contract in New Jersey contains an implied covenant of good faith and fair dealing.").  Defendants allege that Wyndham failed to provide Veneto with a variety of franchisor support services, which the Court divides into the following categories: (1) access to Wyndham's reservation and property management systems, (2) a Spanish-language reservation system, (3) training, and (4) marketing, group sales, and transient sales support.  (Dkt. Nos. 76 & 78 ¶¶ 27–32, 38–43.)  Defendants allege that Wyndham's breaches caused the Veneto's financial distress and, ultimately, Defendants' loss of the hotel.

Wyndham moves for summary judgment on these counterclaims, arguing that Defendants have not adduced enough admissible evidence to create a genuine dispute of material fact.

#### i.    Reservation and Property Management Systems

Defendants' first set of allegations pertains to Wyndham's reservation system.  The Franchise Agreement and Amendment required Veneto to remit fees to cover the costs of Wyndham's centralized reservation and information management systems (*see* Ex. 7 § 3(D); Ex. 15 § 7), and in return, the Franchise Agreement required Wyndham to "make available to [Veneto] the reservation system provided by [Wyndham] for all similarly situated Wyndham Hotels" (Ex. 7 § 8(A)–(B)).

A genuine dispute of material fact exists as to whether Wyndham breached its obligation to provide Veneto with adequate access to its reservation and property management systems.  Evidence in the record reveals the following post-Release issues:  First, during a one-month period, technical issues prevented Veneto customers from booking reservations through

Wyndham's proprietary website. (Dkt. No. 128 ¶¶ 202–32.) Second, at various times, Wyndham's reservations website omitted the Veneto hotel from search results (Dkt. No. 128 ¶¶ 233, 238, 245, 247) and displayed incorrect room rates and availability (Dkt. No. 128 ¶¶ 243, 244, 248). Finally, on at least one occasion, Wyndham's property management system malfunctioned and caused the Veneto to lose access to its customers' credit card information. (Dkt. No. 128 ¶ 282.) Whether these events constitute a breach of contract is for a jury to decide.

Wyndham objects that the exhibits in the record supporting Defendants' claim—primarily emails from Veneto's former Director Irene Vecchi, whom Defendants did not depose—are unauthenticated and inadmissible hearsay. (Dkt. No. 126 at 8.) Wyndham is correct that the emails *themselves* are hearsay not falling within any exception, and Defendants' better course of action would have been to identify Vecchi as a fact witness and to submit an affidavit from Vecchi into the record for summary judgment. Granting summary judgment, however, is harsh medicine for such an oversight. Instead, the Court concludes that Vecchi's emails demonstrate that evidence exists that *could* be admissible at trial, if Defendants call Vecchi to testify to the events discussed in her emails. *See* Fed. R. Civ. P. 56(c)(2) (noting that, on a motion for summary judgment, "[a] party may object that the material cited to support or dispute a fact cannot be presented in *a form that would be admissible* in evidence" (emphasis added)); *see also Milardo v. Town of Westbrook*, 120 F. Supp. 3d 206, 213 n.5 (D. Conn. 2015) ("Because [the plaintiff's] lawyer would be able to testify at a trial [as to a material fact] . . . , his hearsay statement on that point may be considered on summary judgment.").[4]

Accordingly, summary judgment is denied as to this set of allegations.

---

[4]     To the extent Wyndham believes it may be prejudiced by Vecchi's testimony, it is free to request appropriate relief from the Court, such as the opportunity to depose Vecchi before trial.

### ii. Spanish-Language Reservation System and Website

Defendants next allege that Wyndham failed to provide Veneto with a Spanish-language reservation system and website. But such a failure was not a breach of the Franchise Agreement.

The Amendment states that Veneto "shall pay [Wyndham] a monthly National Sales Fee of 0.25% of Gross Room Revenues *until the later of* (i) March 31, 2012 or (ii) such time as a Spanish language reservation system, website and related services for the system have been implemented and tested by Franchisor and are fully operational." (Ex. 15 ¶ 5 (emphasis added).) On the occurrence of both events, Veneto's fee would increase to 1.00%. (*Id.*) As amended, the Franchise Agreement did not obligate Wyndham to provide a Spanish-language reservations website; it merely reduced Veneto's fees until such time as Wyndham chose to do so. Defendants do not allege that they ever paid the higher national sales fee. Consequently, no reasonable jury could find that Wyndham breached an obligation to provide a reservations system in Spanish, and summary judgment is granted on this set of allegations.

### iii. Training

Defendants' next set of allegations has to do with training: The Amendment required Veneto to pay Wyndham a "corporate training fee" "to fund certain training offered by [Wyndham's] corporate training department." (Ex. 15 § 6.)

The Court concludes that this contract provision is ambiguous as to what services were owed to Veneto, and a factual dispute exists as to whether those services were provided. Defendants offer evidence that Wyndham provided training services exclusively in English, which was unhelpful to Veneto's primarily Spanish-speaking employees. (*See* Dkt. No. 128 ¶¶ 361–66.) This problem reportedly persisted after the April 1, 2012 Release. (*See* Ex. CAF

155:16–156:2.)  This evidence is sufficient to raise a genuine dispute that should be resolved by the jury, and summary judgment is denied as to Defendants' training allegations.

### iv.        Marketing, Group Sales, and Transient Sales

Finally, Defendants' last set of allegations pertains to Wyndham's alleged failure to provide marketing services and to facilitate "group sales" (reservations in large blocks) and "transient sales" (one-off reservations to individual customers).  The contractual hooks for these allegations can be found in two sections of the amended Franchise Agreement, which required Veneto to pay: (1) a "marketing fee" "as a contribution to the Central Marketing Fund," and (2) a "national sales fee" "for international group sales services, regional convention sales services and transient business sales services provided by Wyndham's International Sales Office."  (Ex. 7 § 3(C), (E); Ex. 15 §§ 4–5.)

The Franchise Agreement, however, limited Wyndham's obligation to provide marketing services in exchange for these fees.  The Franchise Agreement states that "the Central Marketing Fund is intended to maximize general public recognition" of the Wyndham brand and that Wyndham "undertake[s] no obligation . . . to make expenditures which are equivalent or proportionate to [Veneto's] contribution, or to ensure that any particular franchisee benefits directly or *pro rata* from expenditures from the Central Marketing Fund."  (Ex. 7 § 9(B)(3).)  Similarly, Wyndham promised to provide international-sales-office services, including group booking services, only "[t]o the extent provided generally by [Wyndham] for the benefit of [the Veneto hotel] and other Wyndham Hotels in the same division."  (Ex. 7 § 9(C).)

Based on this contract language, no reasonable jury could find that Wyndham breached its obligations to provide marketing or sales services to Veneto.  Defendants have failed to identify any specific evidence that could show (1) what services were owed to Veneto by

Wyndham, or (2) that Wyndham performed below that minimum threshold. The Franchise Agreement does not include any promises by Wyndham as to a minimum number of reservations or a minimum occupancy level. (Dkt. No. 118 ¶ 39; *see also* Ex. CAF 61:6–13, 62:19–24; Ex. CAG 49:3–18.) And the vast majority of the evidence provided by Defendants cites problems occurring before April 1, 2012 (and consequently subject to the Release), or recounts entirely innocuous exchanges with Wyndham. (*See, e.g.*, Exs. BDD, BDI, BDL, BDN.)

In fact, the only potential evidence of fault comes from Defendants' deposition testimony which, even read in the light most favorable to Defendants, is either impermissibly conclusory or not based on personal knowledge. The following exchange between Alexander Silverman (being deposed on behalf of Silver) and Plaintiff's counsel is typical of those in the record:

> Q: Is there a particular account, particular period of time; can you give me any details on the group sales you contend were not delivered?
>
> A: I mean, there's thousands of documents that we have supplied to you. I can't pinpoint those documents.
>
> Q: Can you give me a period of time during which you contend Wyndham failed to provide group sales?
>
> A: The entire time of the franchise agreement.
>
> Q: Okay. Can you point to any particular instance in which Wyndham failed to deliver group sales?
>
> A: Multiple times. They just didn't – they didn't supply – you know, normally a brand usually delivers a certain percentage of, you know, revenue from corporate sales, group sales.
>
> Q: Is it Silver Entertainment's contention that it suffered damages as a result of Wyndham's failure to supply group sales?
>
> A: Yes.
>
> . . .

Q: Can you give me any estimate as to what Silver Entertainment's damages are alleged to be relating to Wyndham's failure to provide group sales?

A: Several million dollars.

Q: Can you be at all more specific than that?

A: No, I can't.

Q: And how did you calculate several million dollars?

A: I understand the hospitality business.

Q: Understanding the hospitality business, can you tell me how you came up with several million dollars?

A: There are multiple companies that will tell you that a brand would deliver a certain amount of sales on a corporate and a group sale portion of it. Wyndham probably did about a third.

Q: A third of what?

A: What they are required, you know, as part of a brand would do.

Q: And what amount did you believe Wyndham was required to provide in terms of group sales?

A: I don't think there is an amount. As I said to you, it's about a third of what they basically should have provided to us.

(Ex. CAC 89:7–91:9; *see also* Ex. CAF 149:12–24 ("Q: Were there any marketing services that Wyndham was providing? A: I wouldn't have knowledge. You are asking me a day-to-day operational question.").)

Finally, the evidence submitted by Defendants' expert, Jay Litt, does not raise a genuine dispute over Wyndham's marketing or sales services.[5] Litt concludes, somewhat summarily,

5    Wyndham raises a challenge to the admissibility of Litt's expert testimony for the first time in its reply brief. (*See* Dkt. No. 126 at 11–15.) Because the Court concludes that Litt's expert testimony would not raise a genuine issue of material fact with respect to the issues for which it grants summary judgment, the Court declines to decide whether Litt's testimony on the surviving claims would be admissible at trial. Wyndham is free to move to exclude Litt's

that "Wyndham's performance was deficient and inconsistent with industry practice with respect to group sales" and that "Wyndham's performance was deficient regarding transient sales and marketing." (Ex. CAA at 8, 9.) But Litt does not describe industry-standard marketing and sales support services in any detail. Instead, he concludes that Wyndham's marketing services fell short based on (1) evidence in the record from before April 1, 2012, which predates the Release; (2) issues with the Wyndham's reservation system, which is properly considered with respect to Defendants' counterclaim for inadequate access to Wyndham's reservations system; and (3) the lack of a Spanish-language website, which the Court has held was not required under the terms of the Amendment.[6] Litt's expert report cannot create a genuine dispute of fact where the facts themselves do not support such a conclusion. *See Knight v. City of New York*, 303 F. Supp. 2d 485, 498 (S.D.N.Y. 2004), *aff'd*, 147 F. App'x 221 (2d Cir. 2005).

"[T]o avoid summary judgment, [a party] 'may not rely simply on conclusory allegations or speculation . . . , but instead must offer evidence to show that [their] version of the events is not wholly fanciful.'" *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 51 (2d Cir. 2003) (first alteration in original) (quoting *Morris v. Lindau*, 196 F.3d 102, 109 (2d Cir. 1999)). Defendants have failed to carry that burden, and summary judgment is granted on this set of allegations.

---

testimony in an appropriate pre-trial motion, which the Court can decide with the benefit of full briefing.

[6] While the Court is obligated to interpret Litt's report in the light most favorable to Defendants, Rule 56 "does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute." *Amnesty Am. v. Town of W. Hartford*, 288 F.3d 467, 470 (2d Cir. 2002). Defendants' Rule 56.1 Statement cites Litt's report only in the paragraphs relating to damages—not Wyndham's liability. (*See* Dkt. No. 128 ¶¶ 398–545.) The Court will not further traipse around Litt's report or deposition in search of a material dispute.

### 2.    Room-Night Credits

Defendants' second counterclaim alleges that Wyndham incorrectly calculated certain room-night credits against Veneto's recurring fees balance.  (Dkt. Nos. 76 & 78 ¶¶ 33–37.) Wyndham moves for summary judgment, arguing that Veneto's claim is based on negotiations that took place in April 2015 but never led to a binding agreement.

Wyndham's characterization of the dispute is mistaken.  Many of Veneto's recurring fees were measured as a percentage of the hotel's gross room revenues, but the Franchise Agreement allowed Veneto to exclude a certain number of "complimentary room nights," offered to casino guests free of charge, from its calculation of gross room revenues.  (Ex. 7 § 6(B), SE0060021.) In 2015, the parties attempted to resolve a preexisting dispute over Veneto's outstanding fees. But Wyndham's obligation to accurately credit comp rooms derives from the Franchise Agreement, which predates those negotiations.

Therefore, a genuine dispute of fact exists as to whether Wyndham improperly calculated Veneto's room-night credits.  The record reflects ongoing negotiations in the months preceding the termination of the franchise relationship between Wyndham and Veneto about Veneto's credits, and it appears that the dispute was never resolved.  (*See* Dkt. No. 128 ¶¶ 370, 373–97.) If the credits were improperly calculated, Wyndham owes Veneto an offset against its recurring fees or, if the miscalculation is large enough, reimbursement.  Accordingly, summary judgment is denied as to Defendants' second counterclaim for room-night credits.

### 3.    Damages

In sum, a triable dispute of fact exists as to whether Wyndham breached its contractual obligations to provide (1) access to its reservation and property management systems, (2) training to Veneto employees, and (3) accurate room-night credits.  Wyndham argues, however,

that Defendants have failed to identify any recoverable damages as to the first two obligations.[7] (Dkt. No. 109 at 20.)

"Proof of damages is an essential element of a breach of contract claim," *Khrakovskiy v. Denise*, No. 06 Civ. 1033, 2009 WL 3380326, at *10 (D.N.J. Oct. 19, 2009), but "where it is certain that damage has resulted, mere uncertainty as to the amount will not preclude the right of recovery," *Tessmar v. Grosner*, 23 N.J. 193, 203 (1957). "If the evidence affords a basis for estimating the damages with some reasonable degree of certainty, it is sufficient." *Id.*

Defendants have raised a genuine dispute as to the *existence* of damages caused by Wyndham's allegedly inadequate franchisor support services. For example, Defendants allege that Wyndham's failure to provide a functional reservations system caused it to lose potential customers and forced it to pay higher fees to third-party reservation websites. (*See* Dkt. No. 128 ¶¶ 231, 240–41.) The amount of damages resulting from this breach is a question for the jury.

The jury, however, will be subject to legal limitations in calculating any damages award. First, damages must be attributable to Wyndham's post-Release breaches. *See V.A.L. Floors, Inc. v. Westminster Communities, Inc.*, 355 N.J. Super. 416, 423 (App. Div. 2002) ("[T]he party must show that profits were lost as a result of the actionable conduct complained of . . . ." (quoting *Cromartie v. Carteret Savings & Loan*, 277 N.J. Super. 88, 103 (App. Div. 1994))). And second, Wyndham is "not chargeable for loss that [it] did not have reason to foresee as a

---

[7]      Silver is a party to this suit because it guaranteed Veneto's performance under the Franchise Agreement and Amendment. Because Silver is only a guarantor, and not the franchisee, the parties agree that Silver has no standing to recover damages on the counterclaims above the amount of its liability to Wyndham. (*See* Dkt. No. 109 at 25; Dkt. No. 116 at 37.) In other words, Silver's counterclaims can only offset its liability to Wyndham. But because the Assignment did not modify Silver's guaranty, which "remain[ed] in place[] without any further conditions or alterations" (Ex. 8 ¶ 2; Dkt. No. 118 ¶ 44), Silver remains liable to Wyndham to the same extent as Veneto.

probable result of the breach when the contract was made." *Donovan v. Bachstadt*, 91 N.J. 434, 444 (1982).

It is beyond genuine dispute that Veneto's default on its $55 million loan, and its subsequent inability (or failure[8]) to pay its gaming taxes, were not foreseeable consequences of Wyndham's alleged failure to provide training and reservations support services. Such a dramatic consequence is too outsized and too remote a possibility to have been the foreseeable result of spotty technology and shoddy training. Consequently, as a matter of law, Wyndham is not liable for damages flowing from Defendants' loss of control of the hotel.

## B. Wyndham's Claims Against Defendants

Wyndham seeks summary judgment on its three affirmative claims: (1) recurring fees in the amount of $549,963.69; (2) liquidated damages in the amount of $311,135.52; and (3) the outstanding principal due under the Note of $255,000 plus 18% interest. (Dkt. No. 109 at 15–17.) Wyndham asserts all three claims against Veneto and asserts the first two claims against Silver as guarantor.[9]

### 1. Liability

There is no genuine dispute of fact that Defendants failed to perform their obligations under the Franchise Agreement and Amendment. Unambiguous contract language required Veneto to pay Wyndham recurring franchise fees (Ex. 7 §§ 3, 28; Dkt. No. 118 ¶¶ 21–27), which

---

[8] The parties dispute the extent to which Defendants had the financial resources to avoid the GACC default and Gaming Control Board's seizure. (*See, e.g.*, Dkt. No. 118 ¶¶ 91–92, 95; Dkt. No. 128 ¶ 405.) If Veneto's default was financially avoidable, Wyndham argues, then Wyndham is not liable for damages resulting from Defendants' "cho[ice] not to cure." (Dkt. No. 118 ¶ 91.) A jury need not decide this factual dispute, however, because the Court concludes as a matter of law that Veneto's default was not a foreseeable consequence of Wyndham's breach.

[9] Wyndham does not move for summary judgment against Silverman, the Note's guarantor, because the case is stayed with respect to Silverman only.

Defendants admit they did not pay (Dkt. No. 118 ¶¶ 103–04, 114–15). The Franchise Agreement also required Veneto to pay liquidated damages in the event of premature termination. (Ex. 7 § 18(E); Dkt. No. 118 ¶¶ 33–34.) Defendants have not paid these either. (Dkt. No. 118 ¶¶ 112–13.)

There is also no genuine dispute over the Note. Without affirmatively stating that Wyndham *did not* disburse the loan, Defendants attempt to imply as much by stating that "Wyndham *lacked any evidence* [that] the referenced amount was ever disbursed." (Dkt. No. 118 ¶ 47 (emphasis added).) But Wyndham correctly relies on the Note itself, which contained a binding promise that "[t]he principal amount will be disbursed by [Wyndham] to [Veneto]." (Ex. 10 at WHG00008086.) Defendants' attempt to create a genuine dispute over disbursement is therefore unavailing. Furthermore, Defendants do not dispute that the Note's outstanding balance of $255,000, plus interest, became due upon termination of the Franchise Agreement, and that Defendants have yet to pay this amount. (Dkt. No. 118 ¶ 48.)

Defendants, therefore, do not contest that the terms of the Franchise Agreement obligate them to pay the recurring fees, liquidated damages, and loan balance that Wyndham seeks. Instead, Defendants rely on two affirmative defenses that would excuse performance. Both are unavailing.

First, Defendants argue that Wyndham materially breached the Franchise Agreement before Veneto, presumably during the period from 2012 to 2015, thus relieving Veneto of its payment obligations under the agreement. (Dkt. No. 116 at 15.) Indeed, "New Jersey law recognizes that a material breach of contract on the part of one party entitles the other party to terminate it." *Mon Cheri Bridals, LLC v. Bowls*, No. 14 Civ. 8107, 2015 WL 1383948, at *3 (D.N.J. Mar. 25, 2015) (quoting *In re Rappaport*, 517 B.R. 518, 533 (Bankr. D.N.J. 2014)).

The trouble for Defendants, however, is that they did not terminate the Franchise Agreement after those alleged breaches by Wyndham. "Under basic contract principles, when one party to a contract feels that the other contracting party has breached its agreement, the non-breaching party may either stop performance and assume the contract is avoided, or continue its performance and sue for damages." *S & R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 376 (3d Cir. 1992). But '[u]nder no circumstances may the non-breaching party stop performance *and* continue to take advantage of the contract's benefits." *Id.* Under New Jersey law, if the non-breaching party continues to perform and receive benefits under the contract, it waives the right to later claim that the contract was terminated. "[A]ny action indicating an intention to perform will operate as a conclusive choice, . . . depriving [the non-breaching party] of any excuse for ceasing performance on [its] own part." *Ramada Worldwide Inc. v. Clinton Commercial Dev., LLC*, No. 11 Civ. 4920, 2016 WL 5402204, at *2 (D.N.J. Sept. 26, 2016) (quoting *Frank Stamato & Co. v. Lodi*, 4 N.J. 14, 21 (1950)).

By continuing to operate as a Wyndham franchise hotel from 2012 until 2015, Veneto forfeited the right to claim that the Franchise Agreement terminated before Veneto itself breached. Veneto's "continuous performance as a [Wyndham] franchisee during the period in which [it] alleges that [Wyndham] materially breached the contract operates as an election under New Jersey law." *Ramada Worldwide Inc. v. Clinton Commercial Dev., LLC*, No. 11 Civ. 4920, 2016 WL 5402204, at *2 (D.N.J. Sept. 26, 2016). And because Veneto "elect[ed] to continue performing under the contract," its remedy for Wyndham's alleged breach is now limited to

"su[ing] for the damages caused by the breach." *In re Nickels Midway Pier, LLC*, 372 B.R. 218, 223 (Bankr. D.N.J. 2007).[10]

Second, Defendants rely on force majeure clauses in the Franchise Agreement to argue that the Gaming Control Board's seizure of the hotel excused Veneto's performance. (Dkt. No. 116 at 36.) The Franchise Agreement allows early termination of the Franchise Agreement in the event of either a "political event," defined as "conditions that render . . . the performance of this Agreement unlawful" (Ex. 7 § 19(C), SE0060022), or a "force majeure," defined as "acts of God, strikes, lockouts or other industrial disturbances, war, terrorism, riot, epidemic, fire or other catastrophe or other forces beyond [Veneto's] control" (Ex. 7 § 26(H), SE0060021). The Court concludes as a matter of law, however, that Veneto's failure to pay taxes was neither a "political event" nor a "force majeure." Veneto's own financial default, which resulted in Panama's lawful seizure of the hotel, is not the kind of unanticipated, blameless event contemplated by the Franchise Agreement's force majeure clauses.

---

[10]    The Court acknowledges the contrary decision in *Travelodge Hotels, Inc. v. Honeysuckle Enterprises, Inc.*, 357 F. Supp. 2d 788, 797 (D.N.J. 2005), but respectfully finds the logic of later decisions to be more persuasive. *See, e.g.*, *Wyndham Hotels & Resorts, LLC v. Northstar Mt. Olive, LLC*, No. 10 Civ. 2583, 2013 WL 1314747, at *9 (D.N.J. Mar. 28, 2013) (holding that "[Defendants] are barred from asserting Plaintiff's alleged breach of the [Franchise] Agreement as an affirmative defense to liability" because "Defendants did not pay Recurring fees to Plaintiff, even as they continued to operate their hotel as a Wyndham franchise"); *Red Roof Franchising, LLC v. AA Hosp. Northshore, LLC*, 877 F. Supp. 2d 140, 152 (D.N.J. 2012) (holding that even if the franchisor had breached the franchise agreement, the franchisee was still "obligated to pay any fees due under the franchise agreement" because it "continued to take advantage of the contract's benefits" by operating under the franchisor's brand name), *aff'd sub nom. Red Roof Franchising, LLC v. Patel*, 564 F. App'x 685 (3d Cir. 2014); *Knights Franchise Sys., Inc. v. P.C.P.S. Corp.*, No. 06 Civ. 5243, 2009 WL 3526229, at *3 (D.N.J. Oct. 21, 2009), *aff'd*, 420 F. App'x 155 (3d Cir. 2011) (holding that the defendants could not "excuse their continuing non-payment of recurring fees on the basis of [the franchisor's] alleged breach" because "Defendants continued to receive the benefit of the Franchise Agreement—operating the Facility as a Knights Inn—for nearly seven years after [the franchisor's] purported" breach).

Finally, Veneto boldly attempts to avoid liability by arguing that Wyndham did not name Veneto as a defendant in the complaint. True enough. But Veneto later *voluntarily* joined the case so that it could assert its counterclaims. (Dkt. No. 70.) Veneto cannot join the suit only for the upside. In for a penny, in for a pound.

### 2. Damages

There is no dispute that under the Note, Veneto owes Wyndham $255,000 plus 18% interest. The Court grants summary judgment as to this amount.

There is also no dispute that Defendants are liable to Wyndham for unpaid recurring fees and liquidated damages. Both of these sums, however, depend on an accurate calculation of gross room revenues, with the appropriate exclusion of complimentary room nights. Thus, while the Court grants summary judgment as to liability on these claims, it denies summary judgment as to damages.

Finally, the Franchise Agreement allows either party to recover attorney's fees and costs for the successful enforcement of the Franchise Agreement. (*See* Ex. 7 §§ 18(F), 27(F).) Because all claims and counterclaims cannot be resolved on summary judgment, the Court defers determination of attorney's fees and costs until after trial.

## IV. Conclusion

For the foregoing reasons, Wyndham's motion for summary judgment is GRANTED in part and DENIED in part.

Within two weeks of this order, the parties shall submit a joint status letter outlining their proposals for the next phase of this case, including proposed trial dates in the next six months.

The Clerk of Court is directed to close the motions at Docket Numbers 108 and 130.

SO ORDERED.

Dated: March 28, 2018
New York, New York

_____
J. PAUL OETKEN
United States District Judge